IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **ROBERT A. LOUDERMILK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **Case No. 07-CV-118-TCK-FHM** |
| | ) | |
| **STILLWATER MILLING** | ) | |
| **COMPANY, an Oklahoma** | ) | |
| **Corporation, and WILLIAM GLENN,** | ) | |
| **an individual.** | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION AND ORDER

Before the Court is Defendant Stillwater Milling Company's Motion for Summary

Judgment (Doc. 24).  For reasons set forth herein, such motion is denied.

## I.  Factual Background

Defendant Stillwater Milling Company ("SMC"), headquartered in Stillwater,

Oklahoma, is in the business of manufacturing and selling livestock feed and farm supplies.

SMC owns and operates a branch facility located in Claremore, Oklahoma ("SMC

Claremore").  SMC Claremore comprises approximately three city blocks and consists of

two main buildings – a warehouse and a customer store known as the Agri-Center.

Employees are generally hired as warehouse workers or Agri-Center workers.   Alan

Schroeder ("Schroeder"), who has been employed by SMC for approximately thirty-three

years, is the general manager of SMC Claremore.  As general manager, Schroeder supervises

all other managers, including the warehouse manager.  In January 2001, Defendant William

Glenn ("Glenn") was hired as the warehouse manager.  As warehouse manager, Glenn

1

supervised all warehouse employees and made all hiring, firing, and disciplinary decisions for the warehouse as well as daily work assignments.

Plaintiff Robert Loudermilk ("Plaintiff") was hired by Glenn as a warehouse employee on June 1, 2004, at which time Plaintiff was seventeen years of age.  Glenn conducted Plaintiff's orientation and thereafter served as Plaintiff's supervisor.  Plaintiff alleges that, from the outset of his employment, Glenn engaged in sexually charged horseplay and made sexual remarks to Plaintiff.  Plaintiff alleges that, around January 2005, Glenn drove him to the parking lot of Reasor's grocery store and propositioned him for a sexual relationship ("Reasor's conversation"), which Plaintiff refused.  Following the Reasor's conversation, Plaintiff alleges that Glenn repeatedly pressured him to start a sexual relationship with him and repeatedly sexually harassed him during working hours.  Plaintiff alleges that, at some point while serving under Glenn, Glenn promoted him to "Second in Charge" in the warehouse.[1]

On Monday, January 23, 2006, approximately one year following the Reasor's conversation, Plaintiff and his parents reported Glenn's conduct to Schroeder.  During this meeting, which lasted approximately forty-five minutes, Plaintiff and his parents provided Schroeder with the history of alleged harassment by Glenn and also played certain recordings made by Plaintiff during working hours of Glenn speaking to Plaintiff.  These recordings had been secretly made by Plaintiff for several months prior to his report to Schroeder.  Following this meeting, Schroeder instructed Plaintiff not to come to work for a few days while the investigation was being conducted.

---

[1] As explained in more detail below, SMC contends that "Second in Charge" is not a formal position within the company.

The following day, Tuesday, January 24, 2006, Schroeder informed David Fairbanks ("Fairbanks"), a member of SMC's upper management in Stillwater, of Plaintiff's report regarding Glenn.  On Wednesday, January 25, 2006, Fairbanks traveled to Claremore, and Schroeder and Fairbanks conducted an investigation consisting of a meeting with Glenn, a meeting with two warehouse employees, and an additional meeting with Plaintiff and Plaintiff's parents.  The same date, January 25, 2006, Glenn was suspended pending further investigation.  On February 8, 2006, Glenn was terminated based on violation of SMC's harassment policy.  Glenn never returned to work following his suspension on January 25, 2006, and Plaintiff had no dealings with Glenn after the time he made his report.

Following Glenn's suspension, on Thursday, January 26, 2006, Plaintiff returned to work and was reassigned from the warehouse to the Agri-Center, where he worked for approximately six months.  Around the fall of 2006, he returned to the warehouse and worked there until February 28, 2007, when he voluntarily resigned to take a better paying position at another company.  On February 21, 2007, one week prior to his resignation, Plaintiff filed this lawsuit against SMC and Glenn.  Plaintiff's first and second claims – sexual harassment and retaliation – arise under Title VII of the Civil Rights Act of 1964 and are asserted only against SMC.  As to Plaintiff's claim for sexual harassment, Plaintiff seeks to hold SMC liable for Glenn's alleged harassment.  As to Plaintiff's claim for retaliation, Plaintiff alleges that his reassignment to the Agri-Center was a retaliatory adverse employment action and further alleges that co-workers subjected him to retaliatory treatment.  Plaintiff's third and fourth claims – sexual battery and intentional infliction of emotional distress – arise under Oklahoma law and are asserted only against Glenn.  SMC

moved for summary judgment on both claims asserted against it.  Glenn has not filed an answer or in any way responded to the claims asserted against him.

## II.        Summary Judgment Standard

Summary judgment is proper only if "there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the burden of showing that no genuine issue of material fact exists. *See Zamora v. Elite Logistics, Inc.*, 449 F.3d 1106, 1112 (10th Cir. 2006) (citation omitted).  The Court resolves all factual disputes and draws all reasonable inferences in favor of the non-moving party.  *Id.* (citation omitted).  However, the party seeking to overcome a motion for summary judgment may not "rest on mere allegations" in his complaint but must "set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  In the context of a case brought under federal employment laws, the trial court must "make a judgment as to whether the evidence . . . could persuade a reasonable jury that the employer had discriminated against the plaintiff."  *Hooks v. Diamond Crystal Specialty Foods, Inc.*, 997 F.2d 793, 798 (10th Cir. 1998).

## III.       SMC's Liability for Alleged Sexual Harassment by Glenn

In his first claim for relief, Plaintiff seeks to hold SMC liable for violation of Title VII based on Glenn's alleged sexual harassment of Plaintiff.  For purposes of this motion, SMC does not dispute that Glenn's actions toward Plaintiff violated Title VII or that Glenn was Plaintiff's supervisor.   SMC contends, however, that it is entitled to assert the

4

*Faragher/Ellerth* affirmative defense to employer liability and that it has demonstrated, as a matter of law, both elements of such defense.[2]

The Supreme Court has held that "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 764 (1998); *Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1261 (10th Cir. 1998) ("[A]n employer whose supervisory personnel has harassed subordinate employees will be liable for the harassment that occurred even though the employer ultimately stopped further harassment."). When a supervisor's harassment "culminates in a tangible employment action," such as "discharge, demotion, or undesirable reassignment," the employer is automatically liable for the supervisor's actions and is not entitled to an affirmative defense. *Ellerth*, 524 U.S at 764. This is because "[w]hen a supervisor makes a tangible employment decision, there is assurance the injury could not have been inflicted absent the agency relation." *Id.* at 761. However, when a supervisor's harassment does not culminate in a "tangible employment action," the employer has an opportunity to escape vicarious liability by asserting the *Faragher/Ellerth* affirmative defense. *Id.* at 764. This is because "[w]hether the agency relation aids in commission of supervisor harassment which does not culminate in a tangible employment action is less obvious," and the Supreme Court developed the affirmative defense as means of "accommodat[ing] the agency principles of vicarious liability . . . as well as Title VII's . .

---

[2] The *Faragher/Ellerth* defense, which allows employers to avoid liability for harassment perpetrated by supervisors, was established in the Supreme Court cases of *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998).

. policies of encouraging forethought by employers and saving action by objecting employees." *Id.* at 763-64.

In this case, Plaintiff has asserted both theories of employer liability. That is, Plaintiff first argues that SMC is liable for the actions of Glenn because Glenn subjected Plaintiff to "tangible employment actions," such that the affirmative defense is unavailable to SMC. Plaintiff also argues that SMC is liable even if Glenn did not subject Plaintiff to "tangible employment actions" because there are genuine issues of material fact as to both elements of the *Faragher/Ellerth* affirmative defense.[3]

A.    "Tangible Employment Action" Theory of Employer Liability

First, the Court must determine if Glenn's alleged harassment "culminated in a tangible employment action," such that SMC may be liable for Glenn's alleged harassment irrespective of the *Faragher/Ellerth* defense. "A tangible employment action constitutes a *significant change in employment status*, such as hiring, firing, failing to promote,

---

[3] Plaintiff did not couch his arguments in terms of the existence or non-existence of a "tangible employment action." Instead, Plaintiff argued that (1) SMC is strictly liable for Glenn's actions because such actions amounted to "quid pro quo" sexual harassment, and (2) SMC is vicariously liable for Glenn's creation of a sexually "hostile work environment" because SMC cannot satisfy the elements of the *Faragher/Ellerth* defense. (*See* Pl.'s Resp. to SMC's Mot. for Summ. J. 13-17.) However, the Supreme Court expressly rejected this framework for analyzing employer liability and explained that categorization of alleged harassment as "quid pro quo" or "hostile work environment" is not controlling. *Ellerth*, 524 U.S. at 754 ("When we assume discrimination can be proved, the factors we discuss below, and not the categories *quid pro quo* and hostile work environment will be controlling on the issue of vicarious liability."); *Rubidoux v. Colo. Mental Health Inst.*, 173 F.3d 1291, 1295 (10th Cir. 2001) ("In *Burlington Industries*, the Court clarified that 'quid pro quo' and 'environmental' sexual harassment paradigms that have been developed in Title VII litigation do not define the nature or extent of an employer's liability."). Accordingly, the Court rephrased Plaintiff's arguments for purposes of this Order. *See Taylor v. CSX Transp.*, 418 F. Supp. 2d 1284, 1296 n.9 (M.D. Ala. 2006) (reformulating Plaintiff's argument from "quid pro quo" terminology to "tangible employment action" terminology).

reassignment with significantly different responsibilities, or a decision causing a change in benefits." *Ellerth*, 524 U.S. at 761 (emphasis added).  As further examples of actions that satisfy the "tangible employment action" requirement, the Supreme Court listed "'a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a *material* loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.'" *Id.* (quoting *Crady v. Liberty Nat'l Bank & Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir. 1993) (emphasis added)).  The Court contrasted such examples with a bruised ego; a demotion without change in pay, benefits, duties, or prestige; and a reassignment to a more inconvenient job, none of which constitute a tangible employment action. *Id.*  The Supreme Court further stated that a "tangible employment action in most cases inflicts direct economic harm." *Id.* at 762.

In this case, Glenn did not fire, demote, fail to promote, or reassign Plaintiff. Nonetheless, Plaintiff contends that SMC is liable for Glenn's actions based on various actions taken by Glenn while he supervised Plaintiff.  Construing Plaintiff's factual allegations in their most favorable light, Plaintiff contends that Glenn took the following *negative* "tangible employment actions" as a result of Plaintiff's resistance to Glenn's sexual advances: (1) assigning him to various undesirable jobs in the warehouse, including picking

up cigarette butts, "working the door,"[4] discarding wet feed, and "unclogging the pit;"[5] (2) denying Plaintiff overtime hours; and (3) sending Plaintiff home early on two occasions. Plaintiff also contends that Glenn took the following *positive* "tangible employment actions" in an effort to please Plaintiff and/or as a result of Plaintiff's submission to Glenn's sexual advances: (1) giving him an hourly pay raise and allowing him to take a day off after Plaintiff agreed to give Glenn a hug and tell him he loved him; and (2) promoting him to "Second in Charge" in the warehouse.  (*See* Pl.'s Resp. to SMC's Mot. for Summ. J. Fact No. 7(a)-(n).)  Because they require different analyses, the Court will separately address the negative and positive employment actions.[6]

### 1.    *Negative Employment Actions*

First, the Court concludes that assignment to various undesirable tasks in the warehouse does not qualify as a tangible employment action.  Most tasks about which Plaintiff complained, including working the door, discarding wet feed, and unclogging the pit, are jobs that warehouse workers must ordinarily perform.  Picking up cigarette butts was

---

[4]  "Working the door" refers to the duty of loading feed into customers' vehicles. Plaintiff viewed this task as undesirable because it was tedious, and he found it unfairly imposed upon him because the task was typically assigned to the newest employee. Glenn allegedly forced Plaintiff to "work the door" for a period of two months.

[5]  "Unclogging the pit" refers to the duty of shoveling out feed that is clogged in a certain machine.  Plaintiff viewed this task as undesirable because it was difficult work, and he found it unfairly imposed upon him because such task was generally assigned to the person who clogged the pit.  Plaintiff alleges it took him two and a half days to unclog the pit on the relevant occasion.

[6]  The parties did not specifically brief the different legal issues posed by "positive" employment actions alleged to be tangible employment actions, but, as discussed below, the Court finds that separate analyses are necessary in light of Tenth Circuit law.

not a task that warehouse workers ordinarily performed, but Plaintiff was only forced to perform this task for one day.  While unpleasant and perhaps unfairly imposed upon Plaintiff by Glenn, assignment to various undesirable work tasks is not a "tangible employment action."  *See Watts v. Kroger Co.*, 170 F.3d 505, 510 (5th Cir. 1999) (holding that expansion of plaintiff's duties as a member of the produce department to include mopping the floor, cleaning the chrome, and requiring her to check with her supervisor before taking breaks did not constitute tangible employment actions); *Reinhold v. Commonwealth of Va.*, 151 F.3d 172, 175 (4th Cir.1998) (holding that being assigned extra work is not a change in employment status akin to a demotion or reassignment with significantly different job responsibilities and is therefore not a tangible employment action).

Second, with respect to the alleged denial of overtime hours, Plaintiff has not presented any specific evidence as to how often and to what degree Glenn denied Plaintiff such hours.  Plaintiff merely stated that "Glenn denied Plaintiff overtime hours when he was upset with him" and then cited to Exhibit 7, which is his entire Timecard History Report. It is not the Court's duty to review such evidence in an attempt to discern a pattern or other proof that Plaintiff was actually denied such hours in a manner that gives rise to a tangible employment action.  Nonetheless, the Court attempted to review such report to determine if there was any appreciable difference between Plaintiff's overtime hours while working under Glenn and overtime hours following Glenn's departure, but the Court was unable to do so.  As pointed out by SMC, Plaintiff worked 94 hours of overtime in 2005 when he worked for Glenn and 94.5 hours of overtime in 2006 after Glenn's termination, indicating that any alleged denials of overtime by Glenn were not significant.  In addition, Plaintiff did not present any argument specifically related to the denial of overtime that would have

assisted the Court in concluding that such denials amounted to a tangible employment action. Accordingly, while denial of overtime may be sufficient in some cases to constitute a tangible employment action, Plaintiff's evidence is simply not sufficient to create a genuine issue of fact to present to a jury. *See Hansen v. Perry Tech.*, 206 F. Supp. 2d 1223, 1235 (S.D. Fla. 2002) (holding that plaintiff's allegation that he was denied overtime did not constitute tangible employment action because it was not supported by payroll records); *Gay v. Aramark Uniform and Career Apparel, Inc.*, No. H-07-1161, 2007 WL 4190781, at * 7 (S.D. Tex. Nov. 21 2007) (holding that plaintiff's mere allegations of being denied overtime privileges were insufficient to create question of fact as to existence of tangible employment action).

Third, Plaintiff alleges that Glenn sent him home early on two occasions because he was upset with Plaintiff for resisting his sexual advances – January 6, 2006 and January 11, 2006. (Loudermilk Aff., Ex. 2 to Pl.'s Resp. to SMC's Mot. for Summ. J., at ¶ 4(a).) Plaintiff's Timecard History Report verifies that, on January 6, 2006, Plaintiff worked 6.5 hours, and on January 11, 2006, Plaintiff worked 1.25 hours. Assuming for purposes of summary judgment that these lost hours were a result of Glenn's sexual harassment, this resulted in a loss of 8.25 total hours. (*See* Ex. 7 to Pl.'s Resp. to SMC's Mot. for Summ. J., at 33.) Based on Plaintiff's hourly rate of $10.35/hour (*see* Ex. 10 to Pl.'s Resp. to SMC's Mot. for Summ. J.), this resulted in alleged lost compensation of $85.39.

As a general rule, "[i]f the plaintiff can show that [he] suffered an economic injury from [his] supervisor's actions, the employer becomes strictly liable without any further showing." *Ellerth*, 524 U.S. at 761. However, the Tenth Circuit has interpreted *Ellerth* to require that, in order for economic injuries to constitute a tangible employment action, the

resultant economic injury must be "tangible, significant, and/or material." *See Mallinson-Montague v. Pocrnick*, 224 F.3d 1224, 1231 (10th Cir. 2000) (explaining that the Supreme Court was "careful to note that the resultant economic injury must be 'tangible,' 'significant,' and/or 'material'") (quoting *Ellerth*).   In *Mallinson-Montague*,  the Tenth Circuit held that a harasser/supervisor's disapproval of a substantial number of loans originated by the plaintiffs supported the jury's finding of a tangible employment action because such disapproval adversely affected plaintiff's eligibility for commissions and bonuses and because "a substantial portion of the [p]laintiffs' compensation was directly tied to their ability to originate and close loans." *Id.* at 1229.

In this case, the allegations are equivalent to missing one day of work during an alleged eighteen-month period of sexual harassment.  There is no evidence whatsoever that Glenn regularly sent Plaintiff home early, and the two events are isolated in relation to Plaintiff's overall employment history under Glenn.  In addition, Plaintiff in this case offered no argument or authority that would support a conclusion that a relatively insignificant economic injury can result in a tangible employment action.[7]  Although the missed hours resulted in some economic injury, the Court does not view this as the type of significant alteration in employment status intended by the Court in *Ellerth* to qualify as a tangible employment action for purposes of holding an employer strictly liable.  To be clear, the Court's decision does not turn on the dollar amount of the economic injury, as the Court

---

[7]  Plaintiff offered no specific arguments as to the "tangible employment action" theory of employer liability.  (*See* Pl.'s Resp. to SMC's Mot. for Summ. J. 13-14 (making only general argument that "Plaintiff's working conditions and pay were materially affected whether Glenn believed Plaintiff showed the requisite amount of interest in a relationship with Glenn").

recognizes that $85.00 of missed compensation can be as important to one person as $1,000.00 is to another. The Court's decision turns on the insignificance of the amount of hours missed in relation to Plaintiff's overall employment under Glenn and the lack of any "significant alteration" in Plaintiff's employment status as a result of the missed time. Further, the facts of this case are markedly different than those presented in *Mallinson-Montague*, wherein the supervisor engaged in a pattern of conduct that significantly impacted the plaintiffs' overall compensation, their potential to make yearly bonuses, and their potential for advancement in the company. Accordingly, the Court finds that Plaintiff's allegation that Glenn caused him to miss 8.25 working hours is not sufficient to qualify as a tangible employment action that subjects SMC to strict liability for Glenn's harassment.[8]

### 2. *Positive Employment Actions*

The Tenth Circuit does not appear to have addressed a factual scenario in which the supervisor took a positive action based on an employee's submission to a sexual request – *e.g.*, in this case, a pay raise in exchange for a hug – or merely as a means of pleasing the object of the supervisor's affection/harassment – *e.g.*, in this case, a promotion to "Second in Charge" with no sexual favor in return. However, Tenth Circuit cases indicate that employment actions taken by a harassing supervisor must be "adverse" in order to satisfy

---

[8] The Court notes that, in the context of an underlying Title VII claim, courts have concluded that a reduction in hours constitutes an "adverse employment action." *See, e.g., Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1231 (11th Cir. 2006) (citing *Ellerth*'s definition of tangible employment action). However, the Tenth Circuit does not equate these two terms and has implied that "tangible employment action," as used for employer liability purposes, is a stricter term than "adverse employment action," as used for purposes of an underlying Title VII claim. *See Hillig v. Rumsfeld*, 381 F.3d 1028, 1032 (10th Cir. 2004) (explaining that terms are not interchangeable and that "adverse employment actions" are to be liberally defined).

12

the definition of tangible employment action. *See Mallinson-Montague*, 224 F.3d at 1231-32 (twice using word "adverse" to describe the type of employment actions that qualify as tangible employment actions) ("[We] reject [the] assertion that only those *adverse* employment actions amounting to constructive discharge are sufficient to preclude the applicability of the *Faragher/Burlington* affirmative defense.") (stating that plaintiff's evidence was "sufficient to demonstrate that the *adverse* employment action at issue here was significant, material, and tangible") (emphasis added); *Smith v. Cashland, Inc.*, 193 F.3d 1158, 1160 (10th Cir. 1999) (explaining that an employer may avoid employer liability for supervisor's harassment by showing that "no *negative* employment action was taken by the employer"); *see also Desmarteau v. City of Wichita, Kan.*, 64 F. Supp. 2d 1067, 1078 (D. Kan. 1999) ("The concept of tangible employment actions in *Burlington*, however, does not include actions that benefit the plaintiff; it refers only to adverse job actions."). The Court is constrained to follow this language and therefore holds that the positive employment actions in this case – including the pay raise and promotion to Second in Charge – do not qualify as tangible employment actions for purposes of analyzing employer liability.

The Court observes that other circuits have addressed the factual scenario of an employee's submission to a supervisor's sexual demands in exchange for job retention and held that such submission can, in certain cases, constitute a tangible employment action. *See Holly D. v. Cal. Inst. of Tech.*, 339 F.3d 1158, 1169 (9th Cir. 2003) (concluding that "determining not to fire an employee who has been threatened with discharge constitutes a 'tangible employment action,' at least where the reason for the change in the employment decision is that the employee has submitted to coercive sexual demands"); *Jin v. Met. Life Ins. Co.*, 310 F.3d 84 (2d cir. 2002) (same). *But see Lutkewitte v. Gonzales*, 436 F.3d 248,

254 (D.C. Cir. 2006) (Brown, J., concurring) (rejecting Second and Ninth Circuit decisions and explaining that employers should not be held strictly liable unless an "adverse" action is taken because "[w]hen an employee is given a benefit . . . the employer has little reason to suspect that the recipient of the benefit has been discriminated against").[9] Even assuming the Tenth Circuit would follow the Ninth and Seventh Circuits in a case involving repeated submission to sexual acts for the purpose of job retention or job benefits, that is simply not what occurred in this case.  But for one occasion of acquiescing to a hug, Plaintiff resisted Glenn's sexual advances.  Thus, this case is not fairly characterized as a "submission" case in which Plaintiff performed sexual acts in order to maintain the terms and conditions of his employment.

As a whole, the record reflects that Glenn's alleged sexual harassment of Plaintiff did not culminate in any tangible employment action.  Instead, Plaintiff avoided termination, demotion, or any other significant alteration of his employment status as a result of his resistance to Glenn's sexual advances.  Although Plaintiff has alleged some economic injuries, such injuries are either insignificant in light of Plaintiff's overall employment history or are not supported by the record.  Accordingly, SMC cannot be held strictly liable for Glenn's actions but is instead entitled to assert the *Faragher*/*Ellerth* affirmative defense.

B.    "No Tangible Employment Action" Theory of Employer Liability

When no tangible employment action is taken by the supervisor accused of sexual harassment, an employer may avoid liability if it can show, by a preponderance of the evidence, the following two elements: "(1) that the employer exercised reasonable care to

---

[9]  The majority of the court in *Lutkewitte* did not reach the legal question addressed in the concurrence.

prevent and correct promptly any sexually harassing behavior, and (2) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Ellerth*, 524 U.S. at 765. SMC is "entitled to judgment as a matter of law under the *Faragher/Burlington* affirmative defense only if the evidence points but one way and is susceptible to no reasonable inferences supporting the opposing party." *Mallinson-Montague*, 224 F.3d at 1228 (quotation omitted). For reasons explained below, the Court finds that SMC is not entitled to judgment as a matter of law as to the first prong of the affirmative defense and that such prong must be presented to a jury. Because SMC cannot show it is entitled to the defense as a matter of law, the Court does not reach the second prong. *See Wilburn v. Fleet Fin. Group*, 170 F. Supp. 2d 219, 230 (D. Conn. 2001) (failing to reach issue of whether plaintiff unreasonably failed to avail herself of the preventative opportunities because the defendant could not establish first prong as a matter of law).

The first prong requires a showing that SMC exercised reasonable care not only to correct sexually harassing behavior once it was reported by Plaintiff but also to prevent the harassing behavior in the first place. *See Shaw v. Autozone, Inc.*, 180 F.3d 806, 811-14 (7th Cir. 1999) (separately analyzing whether employer took reasonable care to prevent the harassment and then whether employer took reasonable steps to correct the harassment once it was reported); *Wilburn*, 170 F. Supp. 2d at 229-30 (same) The Court finds SMC is not entitled to judgment as a matter of law on this prong of the defense for two primary reasons: (1) there exists record evidence that could lead a juror to conclude that SMC failed to sufficiently train Glenn regarding sexual harassment; and (2) there exists record evidence

15

that could lead a juror to conclude that SMC failed to inform Plaintiff of his right to report supervisor harassment and the manner in which to do so.

First, with respect to Glenn's sexual harassment training, Schroeder testified that he does not recall whether Glenn received any type of orientation when he was hired as warehouse manager. Schroeder testified that the last instance of in-person sexual harassment training for SMC supervisors occurred approximately eight to ten years ago and that the last instance of written materials discussing sexual harassment came enclosed with his paycheck approximately eight to ten years ago, both of which were prior to Glenn's employment. Thus, Glenn had no in-person training and did not receive any written materials on the importance of avoiding sexual harassment in the workplace, which could lead a reasonable jury to conclude that SMC failed to exercise reasonable care to prevent the harassment. *See Harrison v. Eddy Potash, Inc.*, 248 F.3d 1014, 1027-28 (10th Cir. 2001) (upholding jury finding of employer's failure to satisfy first prong because, *inter alia*, supervisor/harasser testified that, following initial distribution of policy manual to supervisors, employer failed to mention policy or conduct seminars on the subject of sexual harassment). *Cf. Shaw v. Autozone, Inc.*, 180 F.3d 806, 812 (7th Cir. 1999) (finding employer exercised reasonable care as matter of law because, *inter alia*, it regularly trained its managers regarding its sexual harassment policies).

Second, there is evidence that SMC did not exercise reasonable care in informing Plaintiff of its sexual harassment policy and reporting procedures.[10]   Although Plaintiff

---

[10]   Plaintiff does not dispute that SMC had in place a sexual harassment policy that defined sexual harassment and specifically stated that "[i]f the complaint relates to a manager, or if for some reason, you do not wish to discuss the problem with the manager, you may complain to the next level of management or to anyone within your chain of

initialed that he read and understood the SMC Manual at the time of his orientation, Plaintiff

testified that Glenn, who conducted his orientation, told Plaintiff that some rules were meant

to be broken, that there was horseplay and sexual innuendo in the warehouse, and that if

Plaintiff had a problem with such behavior he was working at the wrong place.  (*See*

Loudermilk Dep., Ex. 2 to SMC's Mot. for Summ. J., at 144:21-150:10 ("[Glenn] said there

was a lot of grab-assing and stuff like that and if you take that offensive then you're at the

wrong place, so you may as well shut the manual and sign the thing.").  Glenn also told

Plaintiff that "what happens at the warehouse stays at the warehouse."  Thus, Glenn

downplayed the applicability of the sexual harassment policy to warehouse workers and

discouraged Plaintiff from being disloyal to the warehouse by reporting such harassment.

　　　In addition to receiving less than clear instructions from Glenn upon his initial

viewing of the SMC Manual, Plaintiff never received his own copy of the SMC Manual such

that he could review it at a later time.  The warehouse copy of the SMC Manual was kept in

Glenn's desk drawer, which did Plaintiff little good.[11]  With respect to postings regarding

sexual harassment at SMC Claremore, the only postings in the warehouse were on a bulletin

board in Glenn's office, which, again, rendered them useless to Plaintiff.  Although SMC

---

command."  (Ex. 4 to SMC's Mot. for Summ. J.)  However, the existence of such policy
is not determinative.  *See Brown v. Perry,* 184 F.3d 388, 396 (4th Cir.1999) (noting "that
mere promulgation of . . . a [sexual harassment] policy may well fail to satisfy the
employer's burden" under the first prong).

　　　[11]  The problems associated with the SMC Manual being in Glenn's office are
obvious.  In his deposition, SMC's counsel asked Plaintiff "if the policy manual says you
can see the policy manual any time you want to, are you telling me you're unaware of
that as well?"  (Loudermilk Dep. at 152:24-153:8.)   Plaintiff responded: "He's the one
sexually harassing me.  I'm supposed to go to the one that's in charge of me and say,
'Hey, I need to read that sexual harassment policy so that I can get a hold of some people
to get you in trouble.'" (*Id.*)

focuses on the fact that there was also a posting regarding sexual harassment in the Agri-Center break room, Plaintiff and Schroeder testified that Plaintiff was only required to go to the Agri-Center for meetings approximately once per year and that Plaintiff only occasionally visited the Agri-Center during his work day.  Thus, there is no evidence that such posting was in a conspicuous location for viewing by warehouse employees.  Based on these facts, a jury could conclude that SMC did not exercise reasonable care in ensuring that Plaintiff was aware of the means by which he could report harassment perpetrated by the warehouse supervisor or assuring Plaintiff that the sexual harassment policy and any complaints thereunder were taken seriously by SMC management.  *See Harrison*, 248 F.3d at 1027-28 (upholding jury finding of employer's failure to satisfy first prong because, *inter alia*, employer failed to distribute policy to non-supervisory employees, failed to post policy in location that was used by female miners, and the evidence suggested the policy was largely ignored); *Wilburn*, 170 F. Supp. 2d at 229-30  (finding jury question as to whether employer took reasonable care to prevent harassment where there were factual issues as to whether policy was distributed to all employees and/or conspicuously posted).  *Cf. Shaw*, 180 F.3d at 812 (finding employer exercised reasonable care as matter of law because, *inter alia*, it distributed harassment policy to all employees).[12]

### III.    Retaliation

To establish a prima facie case of retaliation, Plaintiff must show: (1) that he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found

---

[12]   The Court's finding of a question of fact is premised on alleged failures occurring prior to Plaintiff's reporting of the harassment and not on SMC's actions following Plaintiff's report.  Indeed, SMC conducted a prompt investigation that resulted in Glenn's termination.

the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action. *Haynes v. Level 3 Communications, LLC*, 456 F.3d 1215, 1228 (10th Cir. 2006). Plaintiff alleges that SMC retaliated against him for reporting Glenn's harassment in two principal ways: (1) reassigning him to the Agri-Center from the warehouse; and (2) failing to prevent co-workers from making rude comments to him and giving him the cold shoulder upon his return to work.

      A.    <u>Reassignment to Agri-Center</u>

Plaintiff alleges that SMC retaliated against him by reassigning him to the Agri-Center for a six-month period between his report and the time he transferred back to the warehouse. Plaintiff contends his reassignment constituted a "demotion" because he was stripped of the "Second in Charge" position he had in the warehouse and because Plaintiff had inferior duties in the Agri-Center to those he had in the warehouse. SMC argues that Plaintiff cannot show that a reasonable employee would have found the reassignment to be materially adverse and therefore cannot satisfy the second element of a prima facie case.

As to the second prong of a prima facie retaliation claim, a plaintiff "must show that a reasonable employee would have found the action materially adverse such that they might be dissuaded from making a charge of discrimination." *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1213 (10th Cir. 2008).[13] In order to be actionable, the retaliation "must produce an injury or harm," and courts must attempt to separate "trivial harms from actionable injuries

---

[13] In *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006), the Supreme Court revised the standard for the second element such that it now turns on whether the action would have dissuaded a reasonable employee from reporting. *See Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1090 (10th Cir. 2007) (explaining impact of *White*).

because Title VII does not establish a general civility code for the American workplace." *Somoza*, 513 F.3d at 1213. Courts are to apply a "reasonable employee standard" because it "avoids the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiffs unusual subjective feelings." *Id.* (quotation omitted).

The Court finds questions of fact preclude summary judgment as to whether the reassignment in this case constituted a materially adverse action. Although SMC contends that there was no such position as "Second in Charge" in the warehouse, Plaintiff and Schroeder both testified that Glenn in fact created such a position. Further, Schroeder testified that Plaintiff was appointed to such position by Glenn (against the advice of Schroeder) and that other warehouse employees held such title at various points in time. Thus, whether formally recognized by SMC or not, there is evidence that a "Second in Charge" position existed and that Plaintiff held such position at some time during his tenure in the warehouse.

Further, although SMC focuses on the fact that reassignment to the Agri-Center did not result in any reduction in pay or benefits, Plaintiff contends it resulted in decreased responsibility, less desirable tasks, and less opportunity for promotion. Because "Second in Charge" was not a formal position in the company, there are significant factual questions as to the duties, responsibilities, and level of prestige that accompanied such position. Plaintiff testified that his duties were to supervise other employees while Glenn was gone, to "write up" employees if they were violating company rules, and to order inventory. Thus, there is evidence that this position resulted in at least some degree of supervisory responsibility, which could contribute to a reasonable employee's job satisfaction. SMC

disputes that such position carried any significant responsibilities or "prestige" that Plaintiff lost as a result of the reassignment.

Assuming Plaintiff held some supervisory position in the warehouse and that his reassignment to the Agri-Center resulted in removal of such duties, a jury could conclude that a reasonable employee would find the reassignment to be a materially adverse action that might dissuade a victim from reporting discrimination.  *See Kessler v. Westchester County Dep't of Social Svcs.*, 461 F.3d 199, 209 (2d Cir. 2006) (holding that plaintiff presented genuine issue of fact as to whether he suffered adverse action for purposes of retaliation claim where plaintiff's transfer stripped plaintiff of certain managerial responsibilities and he was forced to do more tedious work); *see also Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1090 (10th Cir. 2007) (explaining that analysis should not focus on existence of economic injury but should instead focus on whether the action "might have dissuaded a reasonable employee from making or supporting a charge of discrimination") (quotation omitted).  In addition, Plaintiff alleges that he performed less important and less desirable tasks in the Agri-Center than those he performed in the warehouse, which further contributes to his evidence regarding a materially adverse action. *See Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) (concluding that plaintiff's evidence that her tasks after reassignment were dirtier, more arduous, and less prestigious were sufficient to support a jury verdict in her favor on retaliation claim). Accordingly, the Court finds that Plaintiff has presented sufficient evidence to reach a jury

on the question of whether his reassignment from the warehouse to the Agri-Center constituted a materially adverse action by SMC.[14]

      B.    <u>Co-Worker Harassment</u>

Plaintiff also alleges retaliatory treatment by co-workers after he reported Glenn's harassment.   Specifically, Plaintiff contends that some employees gave him the "cold shoulder" and refused to talk to him.  For example, Plaintiff reported an occasion where two employees would not speak to Plaintiff while the three of them were in the lunch room. Plaintiff also recounts an incident involving a co-worker named Terry in which Terry called Plaintiff a "faggot" and a "queer" and accused him of not assisting him with work.  This incident was sufficiently severe to make Plaintiff cry.  As a result of the incident with Terry, Plaintiff called his mother and she came to the warehouse.  Terry then proceeded to tell Plaintiff's mother that Plaintiff was a "faggot" and a "lazy little shit."  There are other alleged instances of stray comments by co-workers, such as Plaintiff being able to purchase a new truck because he sued the company.

The Tenth Circuit has held that "co-worker hostility or retaliatory harassment, if sufficiently severe, may constitute 'adverse employment action' for purposes of a retaliation claim." *Gunnell*, 152 F.3d at 1264.  However, in order to hold SMC liable for co-workers'

---

[14] The Court notes that SMC only moved for summary judgment based on Plaintiff's failure to satisfy the second element of his prima facie case.  SMC did assert facts tending to show that SMC had no retaliatory motive in transferring Plaintiff.  For example, Schroeder testified that he believed, upon [Plaintiff's] return to work, it would be "best to get him out of the warehouse environment for a little while" because "there was quite a bit of talk going on."  (Schroeder Dep., Ex. 1 to Pl.'s Resp. to SMC's Mot. for Summ. J., at 44:11-45:8.)  There is also evidence that Plaintiff initially agreed that this was a reasonable plan under the circumstances.  However, these facts are relevant to the questions of causation and retaliatory motive rather than the existence of a materially adverse action.

treatment of Plaintiff, Plaintiff must show that SMC's supervisory or management personnel either "(1) orchestrated the harassment or (2) knew about the harassment and acquiesced in it in such a manner as to condone and encourage the co-workers' actions." *Id.* There are no allegations that SMC orchestrated the alleged harassment by Plaintiffs' co-workers, but Plaintiff contends SMC's actions constituted "acquiescence" in the alleged harassment in such a manner as to condone and encourage it.

With respect to Plaintiff's allegations that certain employees were giving him the "cold-shoulder" and not speaking to him, Plaintiff reported this to Schroeder. Schroeder told Plaintiff that such employees did not have to talk to him, that it would be better if they did, but that it was best for Plaintiff to just leave it alone. The Court finds this to be a reasonable response to Plaintiff's complaint; it in no way evidences Schroeder's "acquiescence" to the alleged harassment in a manner that encouraged or condoned it. At the time of the incident with Terry, Schroeder was not present in the warehouse, and Schroeder's assistant manager, David Smith, handled the situation. Because it occurred at the end of the work day, Plaintiff and Terry just left for the day. The next time Schroeder was in the office, he was informed of the incident. Schroeder promptly talked to Terry and told him to avoid making such comments to Plaintiff. After this conversation, all name-calling immediately ceased, and Plaintiff did not have further problems with Terry. Again, the Court finds SMC's response to be appropriate and in no way encouraging of the harassment. With respect to any stray comments to Plaintiff, the Court finds no evidence that SMC acquiesced in or encouraged such comments in any manner.

Accordingly, the Court finds insufficient evidence to create a genuine issue of fact as to whether Schroeder, or any other member of SMC management, in any way orchestrated

or acquiesced in Plaintiff's alleged instances of co-worker harassment following Plaintiff's

return to work.  Instead, Schroeder took reasonable measures to deal with all reported co-

worker harassment of Plaintiff.  Even assuming Plaintiff could demonstrate acquiescence

by SMC, it is doubtful that any alleged co-worker harassment in this case, which consists

of the cold-shoulder and name-calling on isolated incidents, could be considered

"sufficiently severe" to constitute an adverse employment action.  *See Gunnell*, 152 F.3d at

1265 ("We doubt that the few actions identifiably taken by co-workers, which generally

seem to involve incidents of rudeness, are sufficient to support a claim for retaliation, given

that Title VII neither is a 'general civility code' nor does it make actionable the 'ordinary

tribulations of the workplace.'").

## IV.    Punitive Damages

SMC also moves for summary judgment on Plaintiff's prayer for punitive damages,

arguing that it is entitled, as a matter of law, to the good-faith defense established in *Kolstad*

*v. American Dental Association*, 527 U.S. 526 (1999).  In *Kolstad*, the Supreme Court "held

that in a Title VII case based on vicarious liability for the acts of a managerial employee, the

employer cannot be liable for punitive damages if the managerial employee's actions were

contrary to the employer's good-faith efforts to comply with Title VII." *Cadena v.

Pacesetter Corp.*, 225 F.3d 1203, 1209 (10th Cir. 2000) (quotation omitted).  Although the

Supreme Court provided no definitive standard for determining what constitutes good-faith

compliance with Title VII, the Tenth Circuit has held that, in order to avail itself of the

*Kolstad* defense, an employer "must at least adopt anti-discrimination policies and make a

good faith effort to educate its employees about these policies and the statutory

prohibitions." *Id.* at 1210.

24

For similar reasons explained above with respect to the first element of the *Faragher/Ellerth* defense, the Court finds questions of fact as to whether SMC made "a good-faith effort to educate its employees about anti-discrimination policies and the statutory prohibitions." *Id.* at 1210.  Glenn, a manager of several SMC employees, received no sexual harassment training during his four years of employment.  Glenn indicated to Plaintiff that the sexual harassment policy contained in the SMC Manual was not to be taken seriously by warehouse workers due to the working environment.  Plaintiff received no sexual harassment training no meaningful instruction as to how and to whom to report harassment perpetrated upon him by his supervisor.  Plaintiff did not receive his own copy of the SMJ Manual, and the only warehouse copy was contained in Glenn's desk.  Further, the only warehouse postings regarding sexual harassment were contained in Glenn's office.  At this stage of the proceedings, the Court cannot conclude that SMC is shielded from punitive damages as a matter of law.  SMC may reurge this issue at the close of evidence.

Defendant SMC's Motion for Summary Judgment (Docket No. 24) is DENIED. However, the Court concludes as a matter of law that SMC is entitled to assert the *Faragher/Ellerth* affirmative defense, and that SMC has not retaliated against Plaintiff based on instances of co-worker harassment.  The parties are ordered to bring to the pretrial conference a revised Pretrial Order that is in conformance with this Order.

**ORDERED this 10th   day of March 2007.**

**TERENCE KERN**
**UNITED STATES DISTRICT JUDGE**

25